DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Wood County Court of Common Pleas, Juvenile Division, that granted permanent custody of Gage, Jeremiah, Anthony and Alanna G. to appellee Wood County Department of Job and Family Services ("DJFS"). For the reasons that follow, this court affirms the judgment of the trial court.
Appellant Lola W., natural mother of the four children, sets forth the following assignments of error:
"ASSIGNMENT OF ERROR I
 "The Trial Court erred in allowing testimony from alcohol abuse counselors regarding natural mother's diagnosis, prognosis, and treatment for alcohol abuse.
"ASSIGNMENT OF ERROR II
 "The Trial Court erred in admitting State's Exhibits 16 and 17 as they were never properly authenticated and contained inadmissible hearsay.
"ASSIGNMENT OF ERROR III
 "The Trial Court's finding that natural mother had placed her children at substantial risk of harm on at least two occasions due to her alcohol abuse was not supported by the evidence."
The facts that are relevant to the issues raised on appeal are as follows.[1] The children who are the subject of this action are Gage G., born February 12, 1993; Jeremian G., born May 11, 1994; Anthony G., born December 8, 1995, and Alanna G., born July 29, 1997. On February 11, 2000, the DJFS filed a complaint alleging that Gage was an abused child. The agency alleged that Ralph S., mother's boyfriend, had hit Gage on the face causing the child injury. Gage was placed in the temporary custody of the agency and after an expedited hearing on March 7, 2000, the trial court ordered the DJFS to provide protective supervision of Gage pending further order of the court. At an evidentiary hearing on May 18, 2000, Ralph S. admitted abusing Gage. The trial court found Gage to be an abused child and awarded temporary custody to the DJFS. The trial court ordered mother and Ralph S. to undergo counseling assessments at Behavioral Connections and to comply with any resulting recommendations.
On December 6, 2000, Wood County Assistant Prosecutor Renee Hess contacted the trial court and asked that Anthony be picked up on an emergency basis pursuant to R.C. 2151.31(A)(3) and (D). Based on the state's representations, the court found that Anthony had been brought to the hospital with a head injury and that the hospital would not release the child due to mother's apparent intoxication. The following day, the prosecutor filed similar requests as to Jeremiah and Alanna, asserting that removal was necessary because the children were residing in a home where the alleged abuse of Anthony was taking place. The trial court ordered that all three children be picked up by the DJFS and placed with the agency until an emergency hearing could be held.
On December 7, 2000, the DJFS filed three separate complaints alleging that Anthony, Jeremiah and Alanna were dependent children and asking for an emergency hearing and temporary custody of the children. An emergency hearing was held on December 7 and, in a December 12, 2000 judgment entry, the trial court ordered that the children be placed in the temporary custody of the DJFS. Following a hearing held on December 22, 2000, the trial court found Anthony, Jeremiah and Alanna to be dependent children and ordered that all prior orders continue. The matter was set for disposition on February 8, 2001 and, in a February 12, 2001 judgment entry, the trial court ordered that temporary custody of the children continue with the DJFS.
On March 28, 2001, the DJFS filed a motion for permanent custody as to all four children. In its motion, the agency alleged that since the time the children were adjudicated there had been a change of circumstance which called for granting permanent custody to the agency. In support of its motion, the agency stated its concerns about mother's substance abuse. The agency stated that appellant's case plan called for her to be assessed for drug and alcohol problems and to follow up with any treatment recommendations. It further stated that on September 7, 2000, Behavioral Connections had recommended that appellant receive inpatient treatment but indicated that intensive outpatient treatment would be acceptable so that appellant could continue caring for her children. On September 29, 2000, appellant had completed the orientation process for her treatment but she failed to show for the October 3 session. The agency alleged that appellant arrived at the October 10 session appearing sluggish and disoriented and smelling of alcohol and that she consented to a breath test that showed a breath-alcohol content of .048 percent. The counselor indicated to appellant that her problem might be more serious than appellant was willing to admit and the treatment session was postponed. The agency further alleged that appellant agreed to begin intensive outpatient treatment on October 13, 2000, but she did not keep the appointment or the one scheduled for October 18 and did not call to cancel. After Anthony, Jeremiah and Alanna were removed from appellant's care in December 2000, Behavioral Connections indicated that she met the criteria for inpatient treatment as she no longer was the primary caretaker for her children. The agency stated that a caseworker met with appellant on December 20, 2000, and appellant refused to participate in inpatient services. Appellant was receiving no treatment at the time the motion for permanent custody was filed.
On May 3, 2001, Kelly Jordan, a children's services worker with the DJFS, submitted a report to the trial court detailing the agency's ongoing involvement with appellant and her family. On May 31, 2001, the agency submitted another report to the trial court in which the agency stated that the boys had been removed from the home of their maternal aunt and uncle because the relatives had decided that they could no longer handle the boys' behavior problems. The children were moved to a foster placement.
On August 6 and 7, 2001, the guardians ad litem for the children filed their recommendations as to custody. In her report, the guardian for Gage concluded that appellant had failed to deal with her chronic chemical dependency; had failed to avail herself of services at Children's Resource Center, where she had been referred; that appellant came to many visitations intoxicated and smelling of alcohol; that Gage was doing well in his current placement and is adoptable, and that there is no realistic prognosis for reunification with either parent due to their inability to comply with the case plan. The guardian recommended that permanent custody of Gage be awarded to the DJFS. In a supplemental report filed on August 23, 2001, the guardian stated that after having interviewed Gage pursuant to appellant's request, her recommendation remained unchanged.The guardian for the other three children also recommended that permanent custody be awarded to the DJFS. In a supplemental report filed on August 22, 2001, the guardian stated that after having completed a final interview with appellant, he continued to believe that appellant had not demonstrated a sincere and consistent motivation to take advantage of alcohol treatment and other services designed to promote a successful reunification. The guardian stated that appellant appeared unable to provide permanency and security for the children, and he restated his recommendation that the agency's motion for permanent custody be granted.
On August 14, 2001, the prosecutor filed a motion for disclosure of appellant's records from Behavioral Connections regarding her diagnosis, prognosis and treatment for alcohol abuse. In support of the motion, the prosecutor stated that she planned to introduce testimony from Behavioral Connections alcohol counselors but believed that Section 2, Title 42, C.F.R. prohibits such testimony unless the court issues an order pursuant to Section 2.64, Title 42, C.F.R. The prosecutor further asserted that the testimony was necessary in order to substantiate its allegations that appellant placed her children at substantial risk of harm on two or more occasions because of her alcohol abuse and that she had refused treatment on two or more occasions. The prosecutor argued that the need for disclosure of the information outweighed the risk of injury to the patient, to her relationship with counselors, or to treatment services. The prosecutor also stated that prior to May 1999, appellant had signed written consent forms authorizing disclosure and that she would not now suffer injury from the disclosure of information that she had previously agreed to release. Lastly, the prosecutor argued that since appellant had failed to engage in any alcohol counseling and services, the patient-counselor relationship did not exist.
On August 16, 2001, the morning of the permanent custody hearing, the trial court heard arguments from counsel as to the motion to disclose. At the conclusion of the arguments, the trial court found that appellant's alcohol abuse counselors would be permitted to testify for the limited purposes of discussing appellant's diagnosis, prognosis and treatment for alcohol abuse. The trial court found that R.C.2317.02(G)(1)(g) would permit the use of the requested information in a permanent custody hearing, that disclosure of the information was necessary to protect against an existing threat or serious bodily injury as alleged in the complaint, and that there was no other way to obtain the information.
At the permanent custody hearing, the state presented the testimony of Kelly Jordan, a case manager with the DJFS. Jordan testified that she received appellant's case in June 1999. She reviewed the family's referral history with the agency and stated that the agency has received a total of twenty-eight referrals in regard to the family. Jordan then summarized the agency's course of action as to each child. She testified that the agency received a referral regarding Jeremiah in March 1999, reporting that he and his younger brother Anthony had been found wandering by themselves in a field approximately a half-mile from their home. The agency requested and received protective supervision of Jeremiah. In December 2000, the agency was granted temporary custody of Jeremiah due to physical abuse by appellant's live-in male companion Ralph S. and due to what the agency perceived as appellant's inability to protect her children due to her alcohol abuse.
Jordan further testified that protective supervision of Anthony was ordered in June 1999, after the children were found in the field. In December 1999, Jordan noticed during a home visit that Anthony had a "substantial" bruise on his forehead and she received several conflicting explanations of how it had happened. The agency requested and received temporary custody of Anthony on December 6, 1999, and has retained custody since then. She also testified that the agency received a physical abuse report in January 2000, regarding Gage and Ralph S. In May 2000, Gage was adjudicated an abused child and the agency was given temporary custody. Jordan testified that the agency received temporary custody of Alanna on December 7, 2000, due to appellant's inability to protect the children after Anthony was removed from the home.
Jordan testified that the agency had attempted to find alternative placements for the children with family members. She stated that the agency had asked appellant for the names of family members but appellant did not comply. The agency finally received a list of family members from appellant's sister. Jordan stated that appellant has been employed on and off during the pendency of the case and that it was her understanding at the time of the hearing that appellant was not employed. She then reviewed the placement history for each child. She further testified that each child has received individual therapeutic counseling and Jeremiah is receiving psychiatric services.
Jordan testified that appellant, on November 2, 2000, was ordered to complete drug and alcohol outpatient treatment at Behavioral Connections and to follow all recommendations. Jordan stated that she met with appellant several times and sent her letters regarding the need to comply with recommended services in order to reunify with the children. She stated that at one time appellant told her she could not afford treatment and said she told appellant that the fees would be waived if she showed that she was indigent. Jordan testified that appellant completed the Children's Resource Center assessment for Anthony and Jeremiah but failed to follow recommendations, which led to the case being closed on two different occasions. Appellant completed one Behavioral Connections assessment but did not follow up on the recommendations. Appellant then received a second assessment in September 2000, and again failed to follow the recommendations. Jordan testified as to several letters she wrote to appellant beginning February 2000, in an attempt to give appellant all the information she would need to engage in services and to help her reunify with her children. Jordan identified a letter she wrote to appellant in February 2000, regarding her failure to follow up with the Children's Resource Center's services. She also wrote to appellant on June 13, 2000, informing her that Staci Simurdak from Behavioral Connections had attempted to reach her on several occasions to schedule another assessment, told appellant how to reach Simurdak, and provided her with times during which Simurdak would be available. In September 2000, she wrote to appellant advising her of assessments that had to take place in order for reunification to occur and reminding her of a scheduled assessment. In August 2000, she wrote to appellant outlining the case plan requirement that she receive a diagnostic assessment at Behavioral Connections and follow all recommendations. Jordan also outlined appellant's non-compliance in the letter and scheduled a meeting to review her concerns. On October 20, 2000, Jordan wrote to appellant telling her she had been informed that appellant was not following through with appointments with the Children's Resource Center and that she should phone the center. She advised appellant that she needed to make an appointment to have Jeremiah and Anthony assessed by the Children's Resource Center. On October 24, 2000, she wrote to appellant reminding her of her non-compliance with the center and advising her of whom to contact to reschedule home visits that had been missed. On November 9, 2000, she wrote to appellant highlighting the objectives of the case plan which included reengaging in community-support services, scheduling a diagnostic assessment for Jeremiah and contacting Behavioral Connections to reengage in drug and alcohol services. At that time, she advised appellant that Gage was approaching twelve months in the agency's temporary custody and that if she did not successfully engage in and complete services the agency would be willing to file a motion for permanent custody. On March 7, 2001, she wrote to appellant summarizing drug and alcohol treatment recommendations she had received and emphasizing her need to reengage in services.
Jordan testified that she had a total of five meetings with appellant in an attempt to get her to engage in case plan services. Jordan stated that when she met with appellant in December 2000, appellant was belligerent and overbearing and said that she was not going to do anything on the case plan and just wanted her children back. She also stated that out of four semi-annual reviews held in this case, appellant attended only one.
Jordan stated that she believed permanent custody to the agency was in the best interest of the children. She stated that appellant had failed to follow through with necessary recommended treatment, was not currently employed, and had no resources to care for the children. She stressed that appellant allowed her children to linger in foster care while doing nothing to complete case-plan requirements.
Jordan further testified that appellant showed consistency in attending the weekly visitations with her children and that for the most part appellant had been calm and compliant when they met. She further testified that appellant said she could not make it to outpatient treatment because she did not have transportation and that she could not take advantage of inpatient treatment once the children were removed because someone might rob her trailer or the pipes might freeze. Jordan testified that her concerns as to the children's safety in the home arose from two incidents of possible abuse at the hands of Ralph S. and from appellant's diagnosed drug and alcohol condition for which she had received no treatment.
Christine Simington, the children's services administrator at DJFS, testified that she did not believe it was in the children's best interest for the agency to continue working toward reunification, in light of appellant's failure to follow through with recommended treatment and the children's lack of stability during that time. Simington referred to the high number of referrals the agency had received arising from appellant's inability to properly supervise her children. She stated that in December 2000, after all of her children had been removed from the home, appellant told Simington she would not seek treatment.
Michelle Poole, a community support, home-based caseworker with the Children's Resource Center, testified that she attempted to work with appellant in 1998, but she received no response to her efforts to contact appellant, so the case was closed until 1999, when appellant contacted the center to schedule another diagnostic assessment upon the request of the agency. Beginning in June 1999, Poole worked with the family to achieve compliance with the case plan. Poole stated that appellant would appear willing to accept her suggestions but when Poole would return to the home the following week there would be no evidence that appellant had implemented any of the suggestions. Specifically, the caseworker noted that appellant did not follow up on Poole's suggestions as to how to make use of resources for the children's special needs or how to cope with the children at home. Poole further testified that appellant was in the home with the children without water for four months but never mentioned it to Poole and did not follow through with Poole's recommendations as to how to locate new housing when appellant was facing eviction from her residence.
Beth Sauppe, a community support worker with the Children's Resource Center, testified that she was assigned to Gage's case in June 2000, and worked with the family until December of that year. Sauppe stated that she provided home-based services, working with appellant and Gage on issues such as parent education, supervision, implementing structure, and recognition of age-appropriate expectations. She further testified that appellant would follow through with suggestions when Sauppe was still in the home but did not follow through on her own when Sauppe was not there.
Stephanie Trumpler testified that in May 2000, she was a hospital liaison and community support program team leader for Behavioral Connections. At that time, Trumpler supervised Staci Simurdak and Trumpler testified that she had conversations with Simurdak about appellant's case. Trumpler identified copies of two letters Simurdak sent to appellant, one of which Trumpler had signed, and stated that the letters were contained in appellant's case file. Trumpler further stated that after meeting with Simurdak, appellant signed a release of information from the DJFS to Behavioral Connections. She further testified that while she was supervising Simurdak, Simurdak requested that appellant come in for a second assessment.
Melissa Jacobs, an outreach counselor with Behavioral Connections, testified as to her contact with appellant following a referral from the DJFS in September 2000, for an updated assessment for an alcohol problem. Jacobs stated that during the assessment she was concerned about appellant minimizing the impact of her alcohol problem on her daily life. Jacobs stated that she recommended an intensive outpatient alcohol treatment program for appellant. Jacobs testified that appellant admitted to drinking an average of three times weekly, six to twelve beers at a time. Appellant told Jacobs that she planned to get very drunk that night because it was her birthday.
Linda Sworden, the women's primary outpatient counselor for Behavioral Connections, testified that after appellant's assessment she received referral information from DJFS and that an appointment was scheduled for orientation into the outpatient program. Sworden met with appellant at the end of September 2000, and explained the program to her. They set a date to meet and develop a written treatment plan but appellant did not attend the meeting. The meeting was rescheduled and appellant did appear, but she smelled of alcohol and appeared to Sworden to be sluggish and disoriented. Sworden identified a letter she sent to Kelly Jorden at the DJFS on January 4, 2001, in which she stated that appellant had not engaged in treatment and was currently in non-compliance with a recommendation. Sworden gave appellant a start date for the treatment program but appellant did not appear on either that date or the rescheduled date and did not contact Sworden after that. Sworden eventually closed appellant's case when she failed to hear from either DJFS or appellant.
Veronica Walters, a nurse in the Emergency Department at Fostoria Community Hospital, testified that on December 6, 2000, she examined Anthony for a head injury, cause unknown. She stated that Anthony was brought in by appellant and that because appellant smelled of alcohol and the cause of the head injury was unknown she and the physician decided to call DJFS. Walters was concerned that appellant would not be able to care for Anthony's injury. Because a friend came to take appellant and Anthony home, they were discharged before the caseworker arrived.
Connie Eaken, appellant's sister, testified that Gage, Anthony and Jeremiah lived with her for a brief period until she told the caseworker that she could no longer handle the children due to their behavior problems.
Sherry Rhoads, another of appellant's sisters, testified that the children were neglected and malnourished when they lived with their mother. She stated that after Ralph S. moved in with appellant the children appeared to her to be abused. Rhoads testified that when she talked to her sister about her concerns appellant said the children got hurt playing. At one time, Rhoads had foster care of Gage and Alanna. She stated that prior to having foster care of Gage and Alanna, she often picked up all four of the children and took them to her house so that she could care for them and feed them. Rhoads described several incidents where appellant appeared at her house intoxicated and attempted to remove Alanna from Rhoads' care. Rhoads further testified that she had seen appellant intoxicated when the children were in appellant's care and said she believed the children were at risk in those situations. She described times when appellant would drive to her house intoxicated, with cases of beer in the car and the children unrestrained. Rhoads testified that on those occasions she would not let appellant take the children with her when she left. She further stated that she has told appellant that she would take the children while appellant sought help but appellant was not interested. Rhoads stated that she did not believe the children should be returned to appellant's care because appellant is sick.
Heather Wildman, appellant's twenty-year-old daughter, testified that appellant used to take care of the children until she started drinking. Wildman stated that appellant's boyfriend Ralph S. hit the children, called them names and told them they were worthless. She testified that appellant was usually present when those things occurred but that appellant did not attempt to stop Ralph. Wildman further testified that there were times when appellant would drive the children places while she was intoxicated. She also stated that her mother told her she wanted Alanna but did not want the boys.
Howard Rhoads, appellant's brother, testified that he had to physically remove appellant from their sister Sherry's home one time when Alanna was living there. He stated that he has seen appellant under the influence of alcohol while the children were with her and that he believed the children were at risk because of her alcohol abuse.
The state rested its case and the following witnesses testified on appellant's behalf.
Philip Perkins testified that appellant had been working for him for the past two or three months on a part-time basis, helping him with his flea market, guitar business and used-car lot. He stated that appellant had never come to work intoxicated and said her work record was very good. Perkins said appellant was living in a two-bedroom trailer that she rented from him. He stated that during the year that he has known appellant he has seen her with her children several times and did not notice anything "out of line" in her treatment of them.
Appellant testified that before the children were taken from her she had fun with them, taking them to the park and to birthday parties. She testified that she gets along with her children "pretty well." Appellant testified that she does not believe she has an alcohol problem because she does not drink more than three cans of beer three or four times a week. She further testified that she had not notified the DJFS of her latest move, as required by her case plan, because she had been too busy and that when she saw Kelly Jordan, her DJFS case manager, several weeks ago she did not consider telling her that she had a new address. She added that she has not used any of the money she has earned while working for Perkins to pay child support. Appellant stated that she was not receiving treatment for alcohol abuse at the time but "probably" would in the future.
Appellant further testified that she had no reason for failing to participate in the alcohol treatment program.
On August 29, 2001, the trial court filed its judgment entry in which it found that: 1) neither parent is capable of addressing the mental health and behavioral issues facing the four children; 2) the children are in need of a permanent, legally secure placement; 3) appellant refused to participate in the recommended alcohol treatment and that her failure is entirely her own responsibility; 4) there was clear and convincing evidence that, despite reasonable case planning and diligent efforts by the DJFS, both parents have continuously and repeatedly failed to substantially remedy the original conditions which caused the children to be placed outside the home; 5) that appellant placed her children at substantial risk of harm due to her alcohol abuse and has rejected or refused at least two treatment options and 6) there is clear and convincing evidence that the children should not be placed with either parent and that it is in the best interest of Gage, Anthony, Jeremiah and Alanna that permanent custody be given to the DJFS. The trial court granted the motion for permanent custody and it is from that judgment that appellant timely appeals.
In her first assignment of error, appellant asserts that the trial court should not have allowed witnesses to testify as to appellant's diagnosis, prognosis and treatment for alcohol abuse. Appellant argues that such disclosure does not meet the requirements set forth in Section 2.64(D), Title 42, C.F.R. for disclosure of patient records.
This court finds at the outset that the provisions of the United States Code do not apply in this case, as the Wood County Department of Human Services is not a federal public health agency. This issue is governed by R.C. 2317.02, Privileged Communications, which permits qualified counselors and social workers to testify to otherwise confidential communications concerning court-ordered treatment or services as follows:
 "The following persons shall not testify in certain respects:
"* * *
 "(G)(1) A * * * professional clinical counselor, professional counselor, social worker * * * concerning a confidential communication received from a client in that relation or the person's advice to a client unless any of the following applies:
"* * *
 "(g) The testimony is sought in a civil action and concerns court-ordered treatment or services received by a patient as part of a case plan journalized under section 2151.412 * * * of the Revised Code or the court-ordered treatment or services are necessary or relevant to dependency, neglect, or abuse or temporary or permanent custody proceedings under Chapter 2151 of the Revised Code." [Emphasis added.]
It is clear from the record that the information offered by appellee was sought in a civil action and concerned "court-ordered treatment or services * * * necessary or relevant to dependency, neglect, or abuse or temporary or permanent custody proceedings * * *." R.C. 2317.02, supra. The trial court therefore properly allowed testimony, based on information in appellant's file, that appellant was diagnosed with an alcohol dependency problem and had failed to follow through with any of the treatment options presented to her following her assessments. Accordingly, appellant's first assignment of error is not well-taken.
In her second assignment of error, appellant asserts that the trial court erred by allowing the state to enter into evidence Exhibit Nos. 16 and 17, which are the two letters written by Staci Simurdak, formerly with Behavioral Connections. The first letter was written to appellant following Simurdak's intake assessment and noted the recommendations she made as a result of the assessment. The letter was signed by both Simurdak and Stephanie Trumpler, her supervisor. The second exhibit was a follow-up letter Simurdak wrote to appellant. Both letters were contained in appellant's case file, which Trumpler was responsible for overseeing as part of her job as Simurdak's supervisor. As explained above, Stephanie Trumpler identified the two letters as part of appellant's file at Behavioral Connections. Appellant's attorney objected to the letters being admitted into evidence, arguing that there had been an insufficient foundation laid to show they were written in the ordinary course of business and that the person who wrote the letters was not present to testify as to their authenticity. The trial court found that there was sufficient foundation laid to establish the letters were generated in the ordinary course of business and that the supervisor of appellant's case had in fact testified as to the authenticity of the letters.
Exhibit No. 16 is the letter written to appellant and signed by both Staci Simurdak and Stephanie Trumpler. Trumpler was called as a witness to authenticate the letters because Simurdak had moved out of the state.
Evid.R. 901(A) states:
"(A)General provision
 The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."
As to Exhibit No. 16, not only was Trumpler able to identify and explain the letter, she had signed it. She was clearly able to establish that the letter is "what its proponent claim[ed]." Evid.R. 901(A) therefore was satisfied as to that letter. As to Exhibit No. 17, the letter which was written later and did not bear Trumpler's signature, Trumpler stated that she had seen the letter and explained that it was a follow-up to the first one. Trumpler testified that the second letter was a part of appellant's case file and that as Simurdak's supervisor she was responsible for the records that were contained in the case file. Again, we find that the witness's testimony was sufficient to establish that the letter was "what its proponent claim[ed]" and satisfied Evid.R. 901(A). Accordingly, appellant's second assignment of error is not well-taken.
In her third assignment of error, appellant asserts that the evidence did not support a finding that she had placed her children at substantial risk of harm on at least two occasions due to her alcohol abuse. Appellant argues that there were no reported cases of her abusing the children.
R.C. 2151.353 provides as follows:
 "(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
"* * *
 "(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 * * * of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 * * * of the Revised Code that the permanent commitment is in the best interest of the child. * * *"
R.C. 2151.414(E) provides that:
 "* * * If the court determines, by clear and convincing evidence, at a hearing held * * * for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: * * *.
"* * *
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be place outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
"* * *
"(12) Any other factor the court considers relevant."
Clear and convincing evidence is that evidence that will create in the mind of the trier of fact a firm conviction as to the allegations sought to be proved. Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. It is our duty to review the record to determine whether there was sufficient evidence before the trial court to meet the clear and convincing standard. State v. Schiebel (1990), 55 Ohio St.3d 71,74.
Based upon the evidence as summarized above, this court finds that DJFS presented sufficient evidence to create in the mind of the trial court a firm conviction that Gage, Anthony, Jeremiah and Alanna G. could not be placed with either parent within a reasonable time or should not be placed with them, and that it was in the children's best interest to grant permanent custody to the Wood County Department of Job and Family Services. The trial court had before it extensive testimony that appellant placed her children at risk by allowing them to live with a man who abused them, by allowing them to live in a home with no water for several months, by failing to feed and clean them, by driving more than once under the influence of alcohol with the children in the car, and by failing to take any action to follow through with treatment options presented to her. Accordingly, appellant's third assignment of error is not well-taken.
On consideration whereof, this court finds that substantial justice was done the party complaining and the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, J.Mark L. Pietrykowski, P.J., JUDGES CONCUR.
[1] Because the children's natural father has not appealed the trial court's decision, the parts of the record that pertain to him are not discussed herein.